# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICHAEL R. ROMERO | * | |
| Plaintiff | * | |
| v | * | Civil Action No. DKC-13-625 |
| PHILLIP MORGAN,<br>DEPT. OF PUBLIC SAFETY AND<br>CORRECTIONAL SERVICES,<br>WEXFORD HEALTH SOURCES, INC.,<br>and CORIZON HEALTH CARE SERVICES | *<br><br>*<br><br>* | |
| Defendants | * | |

***

## **MEMORANDUM OPINION**

Pending are Motions to Dismiss or for Summary Judgment (ECF Nos. 22 and 25) filed on behalf of Defendants.[1] Plaintiff opposes the motions (ECF Nos. 29 and 31). Defendant Wexford Health Sources, Inc. (hereinafter "Wexford") replied to Plaintiff's Opposition (ECF No. 30). The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011).

## **Background**

Plaintiff claims that in May of 2010, he underwent arthroscopic surgery to his right knee in preparation for reconstructive surgery. Plaintiff asserts that Wexford disapproved the reconstructive surgery based on the cost. As a result, Plaintiff claims he can only walk with the use of a cane and his knee "pops out" approximately five times per day, causing pain. ECF No. 1 at p. 5.

---

[1] Only the following Defendants were served: Wexford, Corizon Health Care Services, Sadik Ali, M.D., and Asresahegn Getachew, M.D.. The remaining named Defendants Department of Public Safety and Correctional Services, Ashok Krishnaswamy, M.D., and Bon Secoures Baltimore Health Systems will be dismissed without further effort at service for reasons stated herein. Claims against Morgan and Wilson were dismissed by the court previously. ECF Nos. 3 and 4.

In his Amended Complaint Plaintiff states that Defendants Wexford, Corizon Health Services ("Corizon"), and Krishnaswamy have been aware of his anterior cruciate ligament and medial meniscus tear since July 16, 2010. He claims prior to July 16, 2010, his right knee frequently popped out of the socket, hyper-extended, and caused him to fall. On May 5, 2011, Plaintiff underwent arthroscopic "partial" surgery performed by Dr. Krishnaswamy. Plaintiff describes the partial surgery as failed and states it has left him handicapped since the date of his surgery. He further claims that Dr. Ali and Dr. Getachew did everything in their power to make Plaintiff suffer by depriving him of reconstructive surgery and denying pain medication. He claims Ali and Getachew told him that the "State will not pay for anything, and thus no care or treatment is necessary." ECF No. 10 at p. 4. In addition to his Eighth Amendment claim, Plaintiff alleges the failure to provide him with knee surgery is a breach of contract. *Id*. at p. 7.

Defendants Corizon, Sadik Ali, M.D., and Asresahegan Getachew, M.D. (hereinafter medical Defendants) assert Plaintiff reported that he tore his anterior cruciate ligament (ACL) in his right knee in 1992 or 1993 and began complaining about ongoing knee problems in July of 2010. ECF No. 22 at Ex. 2. Plaintiff was provided pain medication, primarily Neurontin and Ultram, both of which have potential for abuse and addiction.[2] *Id*. at Ex. 1. Dr. Krishnaswamy, an orthopedic surgeon at Bon Secours Hospital, examined Plaintiff on July 16, 2010, and reviewed x-rays as well as an MRI of his right knee. *Id*. Based on his examination, Dr. Krishnaswamy diagnosed Plaintiff with early arthritis, a possible ACL tear, and a possible medial meniscus tear. *Id*. For treatment, Dr. Krishnaswamy recommended arthroscopic surgery

---

[2] Neurontin (gabapentin) is anti-epileptic medication used in adults to treat nerve pain. ECF No. 22 at Ex. 1, p. 3, fn. 1. Ultram is a synthetic analgesic that operates to reduce pain, similar to morphine. *Id*. at p. 6, fn. 3.

with possible future reconstruction.[3] *Id*. The recommendation for arthroscopic surgery was submitted for approval by Corizon physician, Dr. Ava Joubert, on September 20, 2010. *Id*. at Ex. 2, p. 4. On September 28, 2010, Wexford "declined" the surgery[4] and Plaintiff was provided a hinged ACL knee brace. *Id*. at p. 6.

On October 1, 2010, Plaintiff was transferred to Roxbury Correctional Institution (RCI). At the time of his transfer Plaintiff was prescribed Neurontin and assigned to a bottom bunk due to his knee injury. ECF No. 22 at Ex. 1, pp. 8 and 14. On October 27, 2010, Dr. Menon lowered Plaintiff's prescription for Neurontin, from 800 mg to 600 mg. *Id*. at Ex. 2, pp. 15 – 16. Plaintiff complained about the change in his medication on November 3, 2010, and explained that prior to his transfer to RCI there was a plan to put him on Ultram because his knee pain was not controlled. *Id*. at p. 20. On November 9, 2010, Indomethacin[5] was added to Plaintiff's medications and he was continued on 600 mg of Neurontin. *Id*. at pp. 20 – 21.

On December 10, 2010, Plaintiff complained that the Indomethacin was not working. When he continued to complain about the decreased dosage of Neurontin on January 12, 2011, he was prescribed a cane and his lower bunk assignment was renewed. *Id*. at pp. 24 – 26. Plaintiff's knee was examined by Dr. Davis on February 3, 2011, who noted the knee was not locking and was not swollen, nor was Plaintiff experiencing difficulty with standing or deep knee bends. Davis requested physical therapy so that Plaintiff's knee could be strengthened and

---

[3] "Reconstruction involves entirely replacing the torn ligament with other graft tissue (of a ligament type) from around the knee." ECF No. 25, Ex. 2, p. 3.

[4] Approval for the surgery was declined by Wexford, which at that time was the utilization review contractor for the State of Maryland. Physicians who were working for Corizon at that time were required to submit requests for on-site and off-site consultants for medical devices and tests to Wexford for approval. Wexford's utilization review panel, which issued decisions denying or approving requests submitted by Corizon physicians, was not controlled by Corizon or its employees. ECF No. 22 at Ex. 1.

[5] Indomethacin is a non-steroidal anti-inflammatory which reduces hormones that cause inflammation and pain in the body. ECF No. 22 at Ex. 1, p. 3, fn. 2.

3

renewed his prescriptions for Neurontin and Indomethacin. *Id*. at pp. 27 – 31. Davis later submitted a request for arthroscopic surgery on April 4, 2011, noting a failed hinge brace and loose patella (knee cap). The surgery was approved on April 13, 2011. *Id*. at p. 41. On May 5, 2011, Plaintiff underwent surgery at Bon Secours Hospital and was returned to custody with instructions for telephone follow up with the surgeon in one week. *Id*. at pp. 51 – 52. Plaintiff received physical therapy after the surgery. *Id*. at pp. 62, 69, 74, and 76.

Plaintiff was first prescribed Ultram on May 15, 2011, for acute post-operative pain. *Id.* at pp. 66-067. The pharmacist reviewed Plaintiff's medications and recommended decreasing the Neurontin dose to 900 mg because only 47% of the daily dose of 1200 mg. was absorbed, noting that "this explains why higher dosages do not provide any clinical benefit, but [cause] adverse effects." *Id.* at p. 70. On June 22, 2011, when Plaintiff was transferred to Maryland Correctional Institution Hagerstown (MCIH), he immediately submitted a sick call slip for medical housing and a bottom bunk, but declined a nurse visit on June 28, 2011. *Id*. at pp. 79-80 and 85 – 86.

On July 11, 2011, Plaintiff's knee was injected with Kenalog for pain relief and Davis ordered a bottom bunk, neoprene knee sleeve, single cell and assignment to F-2 tier, which is located close to the medical unit and does not require use of stairs. In addition, Plaintiff received a knee brace, cane and renewals of his prescriptions for Neurontin and Ultram. *Id*. at pp. 87 – 96.

Plaintiff was seen by a nurse on September 26, 2011, in response to his complaint of knee pain, but no swelling was observed. *Id*. at pp. 113 – 116. Two days later he was seen by Physician's Assistant (PA) Staub and Dr. Ali. Staub observed that Plaintiff was walking without a cane and without any apparent difficulty and discussed the continued need for his assignment

to a single cell in F-2 tier with Ali. When Plaintiff met with Ali, he was told the arthroscopy was partially successful and that reconstructive surgery such as knee replacement may be required eventually. Ali gave Plaintiff no indication that reconstructive surgery would be approved at that time and continued Plaintiff's housing assignment for another year. In addition, Ali instructed Plaintiff to wear his knee brace and use his cane. *Id*. at pp. 117 – 20.

On October 12, 2011, Getachew examined Plaintiff to evaluate his request for an Ultram refill. Getachew advised Plaintiff it was appropriate to take Ultram immediately after surgery, but that taking addictive pain medication for chronic knee pain was ill-advised. Getachew planned to discuss the pain management issue at a patient care conference and to include an orthopedist in the consultation. When he was informed of the plan, Plaintiff became angry and threatened legal action if the Ultram prescription was stopped. Pending the meeting, Getachew continued the Ultram prescription until January 12, 2012, and discontinued Neurontin. *Id*. at pp. 124 – 25, 128 – 29.

Medical Defendants assert that Plaintiff began a "campaign" to have his prescriptions for Ultram and Neurontin kept intact. He began refusing to be seen by Getachew and instead requested to be seen by Dr. Ali for his refill requests. *Id*. at pp. 126 – 27; 130 -31. When Plaintiff was seen by Staub on November 10, 2011, regarding his complaint that his Neurontin had been discontinued, he was advised that pain management was handled by Getachew. *Id*. at pp. 136 -37.

On November 15, 2011, Plaintiff's pain management was discussed and, based on Dr. Krishnaswamy's diagnosis of early arthritis of the right knee, the providers attending agreed Plaintiff should be tapered off of Ultram over a two week period. Additionally, Plaintiff would be prescribed Indomethacin, which he had taken previously with no reported side effects, for his

5

knee pain. Three days later Plaintiff was informed of the decisions regarding the pain management plan. *Id*. at pp. 138 – 41.

On November 21, 2011, Plaintiff submitted three sick call slips requesting to see a doctor other than Getachew, seeking complete knee reconstruction, and an MRI. On November 24 and 25, 2011, Plaintiff submitted more sick call slips stating he was experiencing side effects from Indomethacin, including pain in the liver area; requesting a referral to a neurologist or pain specialist; and claiming no pain medication had been provided to him. Plaintiff was still receiving Ultram at a tapered dose at that time. *Id*. at pp. 144-148. On November 29, 2011, Plaintiff returned 79 capsules of Indomethacin to medical staff. *Id*. at p. 149.

On December 1, 2011, Ali, Staub, Dr. Yahya, Officer Steele and Plaintiff met to discuss Plaintiff's case. Ali believed this meeting was necessary because of Plaintiff's recent behavior following the changes to his pain medication. Plaintiff was informed that he was not currently assigned to a medical tier; his housing assignment was under the control of correctional staff; and that the health care providers received several anonymous letters reporting Plaintiff walked comfortably without his cane, played basketball, and had made statements to other inmates that he had fooled the medical providers.[6] Ali then advised Plaintiff he would no longer be housed on F-2 tier and would no longer receive opiates or opiate derivatives for pain relief, but that the bottom bunk order would remain in place. *Id*. at pp. 152-153. As planned, Ultram was tapered off and discontinued on December 2, 2011, and Plaintiff was provided with Indomethicin. *Id*. at p. 152.

Plaintiff submitted a sick call slip on December 5, 2011, complaining of right knee pain and stating that he fell and sustained nerve damage. *Id*. at p. 154. On December 10, 2011, he

---

[6] Medical Defendants note that some of the incidents described in the anonymous letters were witnessed by correctional staff.

6

submitted another sick call slip seeking a referral to a neurologist, making no mention of the fall. *Id*. at p. 155. Dr. Siddiqui saw Plaintiff on December 13, 2011, and Plaintiff made no mention of falling. Siddiqui noted that Plaintiff did not appear to be in severe pain, prescribed Naprosyn for pain, and referred him to Ali or Getachew. *Id*. at pp. 156-157.

On December 21 and December 26, 2011, Plaintiff complained that Naprosyn did not work for his pain and upset his stomach. *Id*. at pp. 161-162. Staub examined Plaintiff on December 28, 2011, and he denied having any problems with daily living. Staub then discontinued Plaintiff's prescription for Naprosyn and left the order for Indomethacin in place. *Id*. at pp. 164-165.

Plaintiff submitted another sick call slip on January 8, 2012, complaining about receiving Indomethacin and requesting an orthopedic consultation. *Id*. at p. 166. A nurse responded on January 18, 2012, and referred him to a higher level provider for pain management. *Id*. at pp. 167-168. Plaintiff was seen on February 8, 2012, and again requested a neurology consult, knee reconstruction, as well as renewal of prescriptions for Ultram and Neurontin. The patient was referred to Ali for pain management. *Id*. at pp. 169-170. On February 22, 2012, Plaintiff complained of pain at 8 on a scale of 10, but did not appear to be in distress. *Id*. at pp. 171-172. He was seen by Getachew on March 4, 2012, who noted that Plaintiff's right knee was negative for swelling and still had full range of motion. Getachew advised Plaintiff again that Ultram and Neurontin are not good for treatment of chronic knee pain, and instead prescribed Elavil for pain and referred Plaintiff for physical therapy. *Id*. at pp. 174-177.

On March 14, 2012, Plaintiff was examined by Dr. Didden after he complained that Elavil did not help his pain and caused abdominal discomfort. Didden observed minimal

7

swelling of the right knee without significant joint tenderness and prescribed Nortriptyline in place of Elavil. *Id*. at pp. 178-179.

Ali and Didden evaluated Plaintiff again on April 3, 2012. At the time of his evaluation Plaintiff was not wearing his knee brace. He was assured he did not have a neurological problem, rather, he had patellar instability requiring a hinged brace or quadriceps muscle strengthening: which would not be alleviated by knee replacement surgery. Plaintiff was given exercises which were demonstrated for him and he was advised to wear the knee brace he had been provided. Plaintiff was also advised that Neurontin and Lyrica were not appropriate medications since he did not have neurologically-based pain. Plaintiff was again prescribed Ultram, crushed in water and on a watch-take basis. *Id*. at pp. 180-185.

Plaintiff again requested a prescription for Lyrica during an examination by Dr. Thompson on April 24, 2012, and claimed it had been recommended by his orthopedic surgeon. No recommendation for Lyrica by Krishnaswamy was documented and Thompson instead prescribed Tylenol in addition to Ultram and Nortriptyline for pain. *Id*. at pp. 186-188. Plaintiff began a second round of physical therapy on May 1, 2012, and submitted a sick call slip following the physical therapy evaluation stating that he needed an elevator pass because it was recommended by the therapist. The record of Plaintiff's physical therapy evaluation does not, however, mention a recommendation for an elevator pass.[7] *Id*. at pp. 190-191. Plaintiff continued to receive physical therapy on May 8, 2012, May 10, 2012, May 15, 2012, May 17, 2012 and May 29, 2012. *Id*. at pp. 195, 198, 199, 202, 205-206.

---

[7] On May 9, 2012, Plaintiff was examined in response to a sick call slip requesting permanent feed-in paperwork and an elevator pass and was advised that he did not qualify for either request. *Id*. at p. 196. Plaintiff again requested an elevator pass on May 15, 2012. *Id*. at p. 200.

Plaintiff was transferred to the Maryland Correctional Training Center (MCTC) on June 5, 2012, where he continued to receive Ultram and Tylenol for pain. *Id*. at pp. 208-209. On May 30, 2013, Plaintiff underwent a second arthroscopic surgery by Krishnaswamy. Following surgery, Krishnaswamy recommended quadriceps strengthening exercises and a patella stabilizing knee brace. *Id*. at pp.215-217.

Defendant Wexford asserts Plaintiff has alleged insufficient facts to support a viable claim against it. ECF No. 25. Wexford additionally incorporates by reference the memorandum of law and supporting exhibits filed by Medical Defendants in support of its assertion that the undisputed facts establish that Plaintiff's Eighth Amendment claim is without merit, entitling them to summary judgment in their favor. *Id*.

**Standard of Review**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### Analysis

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) quoting *Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Plaintiff asserts he was informed he would need reconstructive surgery to his right knee following the arthroscopic surgery. ECF No. 29. He attaches as an exhibit to his Opposition Response a report from Krishnaswamy which states in relevant part:

> PLAN: I advised the patient that he would first benefit from arthroscopic surgery of the right knee, which will be done under general anesthesia as an outpatient surgery. Once the internal derangement is corrected and checked on the anterior cruciate tear, he will have a reconstruction after that, which will be an inpatient procedure. I explained the procedures to the patient.

ECF No. 29 at Ex. B, pp. 1 – 2 (consultation report dated July 16, 2010). Plaintiff further claims that when he received the arthroscopic surgery on May 5, 2011, he was told no reconstructive surgery would be performed because the procedure was not approved by Wexford. Plaintiff

11

refers to a surgical report to support this allegation.[8] *Id*. at Ex. C. That report includes a paragraph entitled "indication for procedure" which specifies that "complications include prolonged recovery, . . . or more surgeries, including anterior cruciate ligament reconstruction if it is completely torn." *Id*. In the description of the procedure the surgeon notes that there was a "partial tear of the lateral aspect of the cruciate ligament" and that all other aspects of the cruciate ligament were "intact." *Id*. at pp. 1 – 2. There is no statement in either the surgical note or the final report that reconstruction was requested or declined for approval or that it was even indicated given the condition of Plaintiff's knee. *Id*. at Ex. C and D.

In its Reply, Wexford states that approval for the arthroscopic surgery Plaintiff ultimately received was deferred on October 1, 2010, in favor of conservative treatment. ECF No. 25 at Ex. 1, p. 4. The contracted medical care provider, Corizon, did not appeal the recommendation.[9] Wexford further states that Plaintiff has failed to refute the medical opinion of Dr. Kassahun Temesegen, who advocates use of conservative treatment as appropriate medical care for anterior cruciate ligament tears as they can be successfully treated with immobilization of the knee, physical therapy, and anti-inflammatory aids. *See* ECF No. 25 at Ex. 2.

There is simply no evidence to support Plaintiff's claim that he was denied recommended surgery for purposes of saving money. In his opposition, Plaintiff provides additional medical records in support of his assertions; however, there is no indication that surgery was cancelled due to cost containment measures. ECF No. 29 at Ex. C. There is also no evidence that reconstructive surgery was ever medically indicated for Plaintiff's knee. *Id*. at pp. 1 – 2 (noting

---

[8] Portions of the record submitted by Plaintiff are illegible.

[9] Wexford's role as utilization review manager did not include making a final decision regarding requested medical care. Upon a decision to decline a requested procedure, the medical contractor could appeal any recommended decision made by Wexford and seek a second opinion or refer the case to the Deputy Director of Clinic Services of the Office of Inmate Health for final determination. ECF No. 25 at Ex. 1, pp. 3 -4.

reconstruction indicated if ACL is completely torn and that Plaintiff's ACL had a partial tear). His disagreement with the medical opinion of the doctors treating him or the utilization review process is simply inadequate to form the basis of a constitutional claim with respect to surgery as well as prescription pain relief.

Moreover, the record evidence does not support Plaintiff's claim that he has been denied treatment for the pain he suffers as a result of the condition of his knee. He has been provided with a cane, a knee brace, and multiple medications to address the pain as well as arthroscopic surgery on two different occasions. The initial request for arthroscopic surgery was declined by Wexford in favor of more conservative treatment. ECF No. 25 at Ex. 1, p. 4. During the intervening months before the initial surgery, the evidence establishes that Plaintiff received pain treatment and that his knee was monitored. Following Plaintiff's second surgery, continued care and prescription medications were provided despite evidence from custody staff that Plaintiff was attempting to mislead medical providers regarding the extent of his pain and disability. Plaintiff's assertions that he has fallen "on numerous occasions" causing himself injury is unsupported by any medical records indicating he suffered an injury. ECF No. 29 at Declaration of Michael Romero, pp. 1 – 2. To the extent any medical care provider made statements to Plaintiff to the effect that reconstructive surgery would not be paid for by Wexford, those statements cannot form the basis of a constitutional rights violation absent an established serious medical need requiring reconstructive surgery. In the instant case, there is medical evidence that reconstructive surgery is not currently indicated in Plaintiff's case. Thus, Defendants are entitled to summary judgment in their favor.

The remaining unserved Defendants, Ashok Krishnaswamy, M.D. and Bon Secours Baltimore Health Systems, will not be required to respond to the Complaint. The claim as to

13

Krishnaswamy appears to be based only on the fact that he was involved in the course of care provided to Plaintiff and there are no claims raised against Bon Secours Health. ECF No. 1 at p. 5. There is no evidence or even an allegation that Krishnaswamy denied Plaintiff needed medical care, and having concluded the medical care provided did not run afoul of Plaintiff's Eighth Amendment rights, any claims against him based on denial of medical care are without merit.

    A separate Order follows.


  March 20, 2014                                      _____/s/_____
Date                                                    DEBORAH K. CHASANOW
                                                          United States District Judge